**The PEOPLE of the State of Colorado, Complainant**

**v.**

**Daynel L. HOOKER, Respondent.**

**Nos. 11PDJ084, 13PDJ002, 12PDJ004, 12PDJ088.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Oct. 18, 2013.

**OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(c)**

On August 29, 2013, the Presiding Disciplinary Judge ("the Court") held a sanctions hearing pursuant to C.R.C.P. 251.15(b). Kim E. Ikeler appeared on behalf of the Office of Attorney Regulation Counsel ("the People"), and Daynel L. Hooker ("Respondent") appeared with her counsel, David C. Little. The Court now issues the following "Opinion and Decision Imposing Sanctions Pursuant to C.R.C.P. 251.19(c)."

## I. SUMMARY

Absent significant mitigating factors, disbarment is generally appropriate when an attorney knowingly converts client funds or abandons the practice of law, causing serious injury or potential injury to clients. In this case, Respondent abandoned six clients, converted funds in six matters, practiced law without a license in another, and then failed

to cooperate in the resulting disciplinary proceedings. The Court finds the appropriate sanction is disbarment.

## II. *PROCEDURAL HISTORY*

The People filed their complaint in case number 11PDJ084 on November 8, 2011. Respondent failed to answer, and the Court granted the People's motion for default on December 20, 2012. On January 13, 2012, the People filed a complaint in case number 12PDJ004.

On December 8, 2011, the People sought a contempt citation pursuant to C.R.C.P. 251.10(b)(2) against Respondent, filed under case number 11PDJ093. On January 26, 2012, the Court held a status conference in that case. Respondent asserted that she was unable to understand the disciplinary proceedings pending against her and could not defend herself. The next day, the Court placed case numbers 11PDJ084, 11PDJ093, and 12PDJ004 in abeyance, initiated a disability proceeding pursuant to C.R.C.P. 251.23(c), and ordered Respondent to undergo an independent medical examination ("IME"). Dr. Michael Sturges conducted the IME on February 11, 2012, and issued a report on February 22, 2012. The Court placed Respondent on disability inactive status on March 23, 2012.

All three cases were resumed on November 19, 2012, when the Court discharged Respondent's disability inactive status under C.R.C.P. 251.23(d)(3). However, she remained on disability inactive status pursuant to C.R.C.P. 251.23(a).[1] The Court then ordered Respondent to file her answer in case number 12PDJ004 by December 3, 2013. Despite receiving two extensions, Respondent did not answer.

The People filed a third complaint against Respondent on December 18, 2012, under case number 12PDJ088. Respondent never filed an answer. On February 15, 2013, the Court granted default in case numbers 12PDJ004 and 12PDJ088 and consolidated these cases with case number 11PDJ084.[2] The People filed a fourth complaint, in case number 13PDJ002, on January 14, 2013. Respondent again did not file an answer, and the Court entered default on March 20, 2013.

Upon the entries of default, the Court deems all facts set forth in the four complaints admitted and all rule violations established by clear and convincing evidence.[3]

Respondent represented herself in these four consolidated matters until April 12, 2013, when Little entered his appearance. After several resettings, a sanctions hearing was eventually scheduled for April 24, 2013. At that hearing, the Court heard testimony from the People's first witness and then recessed.[4] After the break, Little orally moved to set aside the entries of default in the four consolidated cases, contending that Respondent's mental state impaired her ability to answer the People's complaints. The People objected to Respondent's motion, but the Court continued the sanctions hearing pending a hearing on the motion to set aside the defaults. The Court also ordered Respondent to undergo a second IME with Dr. Sturges. Respondent underwent the IME on May 25, 2013, and Dr. Sturges issued his second report on June 10, 2013.

On June 7, 2013, Respondent filed a petition to withdraw her motion to set aside the defaults, which the Court granted. The matters then proceeded to a second sanctions hearing on August 29, 2013. At this hearing, the Court heard testimony from Maria Flores, Maria Padilla,[5] Kevin Vessels, Sally Zeman, Dr. Michael Sturges, and Respon-

---

1.  C.R.C.P. 251.23(d)(3) applies when an attorney alleges a disability that impairs her ability to defend herself in a pending disciplinary proceeding. On the other hand, C.R.C.P. 251.23(a) prohibits an attorney who is unable to fulfill her professional responsibilities from practicing law. The Court discharged Respondent's disability status pursuant to C.R.C.P. 251.23(d) when she failed to respond to a show cause order.

2.  Case number 11PDJ093 was dismissed on January 2, 2013, after the People withdrew their request for a contempt citation.

3.  *See* C.R.C.P. 251.15(b); *People v. Richards*, 748 P.2d 341, 346 (Colo.1987).

4.  Respondent attended this hearing by telephone.

5.  A Spanish-language interpreter translated Flores's and Padilla's testimony.

dent and admitted the People's exhibit A.[6] In issuing this opinion and decision, the Court also considers an affidavit by Ahmed Jara Tulu, which the People filed on August 26, 2013, as well as Dr. Sturges's two IME reports.[7]

### III. *ESTABLISHED FACTS AND RULE VIOLATIONS*

■ This case involves extensive misconduct in eight client matters. Because Respondent has defaulted, the admitted facts and rule violations of each matter are presented in abbreviated form. Further details are available in the People's four complaints.

Respondent is a Wisconsin attorney registered under Wisconsin attorney registration number 1033854; she is not licensed in Colorado. At all relevant times, however, Respondent practiced law in Colorado and was the principal of the DLH Law Firm located in Aurora, Colorado. She is thus subject to the Court's jurisdiction in these disciplinary proceedings.[8]

### 11PDJ084—Vessels Matter

In 2007, Kevin Vessels, the principal of CFH Productions, was creating a documentary film entitled "A Call for Help." Vessels hired Respondent to prepare an operating agreement and articles of organization and to assist him in forming business entities for CFH Productions. He paid Respondent $550.00 as a retainer and to cover filing fees. Respondent drafted an operating agreement for CFH and corresponded with Vessels's business partner regarding the contents of the agreement. On January 29, 2007, Respondent filed articles of organization for CFH and listed DLH Law Firm as CFH's registered agent. On May 1, 2007, Respondent filed articles of organization for A Call For Help, LLC, again listing DLH Law Firm as the registered agent. By practicing law without a Colorado license, Respondent violated Colo. RPC 5.5(a), which proscribes lawyers from practicing law in a jurisdiction where doing so violates the applicable regulations of the legal profession.

### 12PDJ004—Tulu Matter

Ahmed Jara Tulu hired Respondent in 2009 to help him bring his Somalian nephew, a fourteen-year-old orphan, to the United States. Tulu agreed to pay Respondent a $2,000.00 flat fee to file an "Orphan Petition" on behalf of his nephew. He paid Respondent the entire flat fee, as well as $825.00 for filing fees. Respondent deposited $525.00 of the filing fees into her firm's operating account but did not deposit the remaining $300.00 into her firm's trust account. Respondent never performed the agreed-upon work. In March and May 2010, Tulu wrote to Respondent, asking for the return of his file and fees. After some delay, Respondent delivered Tulu's file to his new attorney. In October 2010, Tulu requested a detailed accounting of Respondent's services, but she never complied, nor did she refund Tulu's fees.

Through this misconduct, Respondent violated Colo. RPC 1.15(a), which requires an attorney to hold client property in a trust account separate from the lawyer's own property. She also committed three separate violations of Colo. RPC 1.15(b), which requires lawyers to promptly, upon a client's request, render a full accounting regarding funds in which the client has an interest. In addition, Respondent violated Colo. RPC 1.16(d), which requires an attorney to protect the client's interest by surrendering papers and property to which the client is entitled and to refund any unearned fees or expenses. Finally, Respondent violated Colo. RPC 8.4(c), which proscribes conduct involving dishonesty, fraud, deceit, or misrepresentation, when she knowingly converted Tulu's $825.00 filing fee.

---

6. Although C.R.C.P. 251.15(b) states that reports of investigation shall be considered in opinions following default no such reports were filed with the Court.

7. The People objected to the Court's consideration of Dr. Sturges's IME reports on hearsay grounds. The Court overruled that objection.

8. *See* Colo. RPC 8.5(a) ("A lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the lawyer provides or offers to provide any legal services in this jurisdiction.").

## 12PDJ088—Kabuuza Matter

Nicholas Spitzer married Gertrude Kabuuza, a citizen of Uganda, in July 2009, and filed a Form I–130 (Petition for Alien Relative) on her behalf. On September 14, 2009, Respondent agreed to represent Kabuuza at a December 2009 removal hearing. A week later, Kabuuza entered into a fee agreement with Respondent for $4,500.00, including $1,010.00 as a fee for filing Form I–485 (Application to Register Permanent Residence or Adjust Status). Kabuuza paid Respondent $2,010.00 by check. Respondent did not deposit these funds into her trust account.

On November 2, 2009, Respondent sent to the United States Citizenship and Immigration Services ("USCIS") a $340.00 filing fee, Form I–765 (Application for Renewal of Employment Authorization), Form G–28 (Entry of Appearance), and other related documents. Respondent indicated on Form G–28 that she was entering her appearance for Kabuuza and filing Form I–485, as well as Form I–765. Although USCIS confirmed receipt of Form I–765 on November 19, 2009, there is no record that Respondent submitted Form I–485.

Respondent and Kabuuza appeared in immigration court for the removal hearing on December 30, 2009, but it was reset for September 2010. On January 5, 2010, USCIS sent Respondent a request for additional evidence to demonstrate that Form I–485 had been filed. Kabuuza paid Respondent another $1,010.00 on January 22, 2010, for the Form I–485 filing fee. Respondent deposited these funds into her personal checking account on January 25, 2010, and withdrew $1,003.88 that same day.

On April 8, 2010, USCIS notified Respondent that it had denied Kabuuza's Form I–765 because Respondent had failed to submit evidence of having filed Form I–485. On May 8, 2010, Respondent submitted another Form I–765, a $340.00 filing fee, and an entry of appearance. USCIS received these documents on May 14, 2010. On August 30, 2010, USCIS again requested additional evidence that Respondent had filed Form I–485. On November 22, 2010, USCIS denied Kabuuza's Form I–765 application because Respondent failed to establish that she had filed Form I–485.

Sometime in February 2011, USCIS notified Kabuuza of its intent to deny her Form I–130 unless she supplied additional proof of her marriage. In March, Kabuuza asked Respondent to return her file because she was becoming frustrated with Respondent and wanted handle the matter on her own. Respondent told Kabuuza that she was drafting a letter regarding Form I–130 and asked Kabuuza to review it. Kabuuza agreed and gave Respondent additional supporting documents. However, three weeks later, USCIS denied Kabuuza's Form I–130. Kabuuza later learned that Respondent never submitted the additional documents. Kabuuza attempted to contact Respondent, but her phone was no longer in service and her office was vacant. Kabuuza did not hear from Respondent again.

Respondent never filed Form I–485 on Kabuuza's behalf, even though her bookkeeping records indicate that she collected the $1,010.00 filing fee from Kabuuza on two occasions. She never returned Kabuuza's fees, nor did she place them in her trust account. Respondent also did not provide billing statements to Kabuuza or return her file. Throughout the course of the representation, Respondent was difficult to reach and did not inform Kabuuza of the status of her case. Ultimately, Respondent abandoned her representation of Kabuuza.

Through the aforementioned conduct, Respondent violated Colo. RPC 1.3, which requires attorneys to act with reasonable diligence and promptness when representing a client; Colo. RPC 1.4(a)(3) and (4), which provide, respectively, that an attorney must keep a client reasonably informed about the status of the matter and that an attorney must promptly comply with reasonable requests for information; Colo. RPC 1.15(a); and Colo. RPC 1.16(d). Finally, Respondent violated Colo. RPC 8.4(c) by knowingly converting Kabuuza's funds.

## 12PDJ088—Rucker Matter

Sometime in 2010, Edith Rucker hired Respondent to assist her in filing a Chapter 7 bankruptcy. Respondent advised Rucker

that her bankruptcy would cost $1,300.00, with a $300.00 advance. Rucker promptly paid Respondent $100.00, but Respondent did not deposit the money into her trust account. Rucker paid Respondent an additional $100.00 on January 4, 2011, yet again Respondent did not deposit these funds into her trust account. Respondent never gave Rucker a written fee agreement.

On February 4, 2011, Respondent called Rucker, asking for an additional $100.00. Rucker brought the money to Respondent's office. This was the last time Rucker spoke with Respondent. Rucker believed that once she had given Respondent the $300.00, Respondent would file the bankruptcy petition and pay the $300.00 filing fee. Respondent, however, deposited Rucker's $100.00 payment into her trust account and withdrew that amount the same day, leaving a balance of $131.67.

Rucker emailed Respondent on April 16, 2011, indicating that she had visited Respondent's office on several occasions, left letters under the door, and spoken with the leasing office in an attempt to reach her. She requested a refund of the $300.00. Respondent did not reply. Although Respondent drafted a bankruptcy petition for Rucker, she never filed the petition, thereby abandoning Rucker's case.

Through this conduct, Respondent violated Colo. RPC 1.3; Colo. RPC 1.4(a)(3) and (a)(4); Colo. RPC 1.5(b), which requires attorneys to communicate their fee structure to their clients in writing within a reasonable time the basis or rate of their fees; Colo. RPC 1.15(a); and Colo. RPC 1.16(d). Additionally, Respondent knowingly converted Rucker's $300.00 in contravention of Colo. RPC 8.4(c).

### 12PDJ088—Pena Matter

In January 2008, Alejandro Robles Pena learned that he was subject to an order of removal in absentia because he had failed to appear for a hearing in August 2007. On January 9, 2008, Respondent agreed to defend Pena's removal proceedings for an advance of $1,200.00 and an additional fee of $150.00 per month. Pena and his wife, Maria

Padilla, paid Respondent a total of $2,900.00 in cash in 2008.

On February 20, 2008, Respondent prepared a "Notice of Entry of Appearance" for immigration court but did no other work on Pena's case until 2010. In September 2010, Pena was arrested and detained in the Broomfield jail with an immigration hold. His bail was set at $250.00. Although Respondent advised Padilla to post the bail so that Pena could be released, Pena was deported on September 9, 2010. Respondent filed a motion to reopen Pena's case on September 10, 2010, arguing that Pena had not received notice of the August 2007 hearing.

On October 6, 2010, the immigration court granted Respondent's motion to reopen Pena's removal proceedings and set a hearing for January 4, 2011. Pena was unable to attend this hearing, however, because he had been deported. After he was deported, Pena was only able to reach Respondent's secretary, who informed Pena that Respondent was sick and the office was closed.

Respondent appeared with another attorney in immigration court on behalf of Pena in January 2011. She informed Padilla that she and the other attorney had convinced the court that Pena's removal was improper and that she needed to determine what paperwork should be filed in order for Pena to reenter the United States legally. This was the last time Padilla spoke with Respondent. Respondent took no further action on Pena's behalf, thereby abandoning his case. Throughout the representation, Padilla experienced difficulty in reaching Respondent, who was only communicative when a monthly payment was due.

In the Pena matter, Respondent violated Colo. RPC 1.3, 1.4(a)(3), and 1.4(a)(4) by failing to take any meaningful action on Pena's behalf, disregarding his attempts to communicate, and abandoning him.

### 13PDJ002—Canales Matter

On May 12, 2008, Juan Canales and his wife, Maria Flores, hired Respondent to defend Canales in removal proceedings. Respondent's fee agreement required Canales to pay her $4,500.00 and additional filing

fees. Canales made an initial payment of $1,500.00 and periodic payments of $500.00 thereafter. Canales made his last payment in December 2008. Respondent placed only a portion of those fees into her trust account. By September 2010, she had consumed Canales's funds and her trust account balance had dipped to a few hundred dollars.

During the course of the representation, Respondent met with Canales and Flores only four times. After making their last payment, Canales and Flores called Respondent to verify a court date, but Respondent's assistant refused to give them any information. Respondent never called them back to explain the status of Canales's case.

Respondent, Flores, and Canales appeared in immigration court sometime in 2010, rescheduling the removal hearing until January 2012. When Respondent last spoke with Flores, Respondent agreed to make an appointment but never did so. Flores and Canales did not hear from Respondent after August 2010. From that time forward, Respondent effectively abandoned them, and they had to hire a new attorney. Respondent never provided Flores or Canales with billing statements or an accounting of her fees, nor did she return the unearned portion of Canales's retainer.

On September 16, 2011, the People mailed Respondent a request for investigation. Respondent did not respond. The People then sent her reminder letters on October 18, 2011, and November 11, 2011. On February 15, 2012, the People requested that Respondent produce Canales's files, along with her time and accounting records. Respondent did not respond or otherwise participate in the People's investigation.

Through this conduct, Respondent violated Colo. RPC 1.3, 1.4(a)(3)-(4), 1.15(a), 1.16(d), and 8.1(b), which prohibits an attorney from knowingly failing to respond to a lawful demand for information from a disciplinary authority. Finally, Respondent knowingly converted the unearned portion of Canales's retainer in violation of Colo. RPC 8.4(c).

## 13PDJ002—Orozco–Lopez Matter

Eriberto Orozco–Lopez, who is married to Beverly Marquez, hired Respondent on September 29, 2008, to defend him in removal proceedings. Orozco–Lopez agreed to pay Respondent a $4,500.00 retainer, and he gave her $1,000.00 that day. He was to pay Respondent $300.00 every other pay period until the $4,500.00 was paid in full.

On October 29, 2008, Respondent appeared for Orozco–Lopez's master calendar hearing. The court reset the hearing, which was eventually held on April 7, 2010. Respondent advised the couple that she had been suspended from the practice of law and that Robin Roberts, another attorney at her firm, would represent them at the hearing in April. Although the couple had never met Roberts, he appeared at the April hearing and succeeded in resetting the hearing for February 23, 2011. At this February hearing, Respondent appeared with Orozco–Lopez; his "Individual Hearing" was then set for September 6, 2012.

Around the time of the February hearing, Marquez went to see Respondent, who was in the process of moving her office. Marquez asked her why she was not notified of the move. Respondent replied that she had been very busy merging her practice with the Crawford Law Center. Marquez made an appointment to meet with Respondent at the Crawford Law Center in May 2011 to sign a Form I–130. Respondent informed her that she and Orozco–Lopez could expect a notice from USCIS in a couple of months, but they never received one. Orozco–Lopez and Marquez attempted to contact Respondent several times, but Respondent did not return their calls. An employee of Crawford Law Center told Marquez that Respondent no longer worked there.

Orozco–Lopez paid Respondent $5,220.00 for her promised services and $695.00 in filing fees. Respondent did not earn the majority of these fees, did not file Form I–130, and did not pay any filing fees associated with that form. Nor did she provide Orozco–Lopez and Marquez with billing statements or an accounting of her fees. Respondent effectively abandoned their case. Orozco–Lopez and Marquez hired a new at-

torney who asked Respondent to return Orozco–Lopez's file. Respondent did not do so.

On November 10, 2011, the People mailed Respondent a request for investigation, but Respondent did not answer. The People reminded Respondent of her obligation to respond in December 2011 and January 2012, but she still did not respond. The People wrote to Respondent a fourth time on February 15, 2012, asking for Orozco–Lopez's file and an accounting of her time and expenses related to his case. Respondent failed to respond and did not participate in the People's investigation.

In the Orozco–Lopez matter, Respondent violated Colo. RPC 1.3, 1.4(a)(3)-(4), 1.15(a), 1.16(d), and 8.1(b). Additionally, Respondent knowingly converted Orozco–Lopez's funds in violation of Colo. RPC 8.4(c).

### 13PDJ002—Hernandez Matter

On May 7, 2008, Respondent and Juana Berenice Hernandez entered into a flat-fee agreement for the preparation and filing of three immigration forms. Hernandez paid Respondent a total of $4,035.00, including a $435.00 filing fee. Hernandez spoke with Respondent from time to time thereafter, inquiring about the status of her case, and Respondent assured her that the forms were being prepared. Respondent became increasingly difficult to reach, however, and she never performed any of the agreed-upon services, ultimately abandoning the representation. Hernandez was forced to hire a new attorney. Through her conduct, Respondent violated Colo. RPC 1.3, 1.4(a)(3)-(4), 1.15(a), and 1.16(d). She also knowingly converted Hernandez's funds in violation of Colo. RPC 8.4(c).

### IV. SANCTIONS

■ The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[9] In imposing a sanction after a finding of lawyer misconduct, the Court must consider the duty violated, the lawyer's mental

state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* Respondent violated duties she owed to her clients when she did not pursue their cases diligently, failed to communicate with them, and did not safeguard their funds. She also disregarded her obligations to her clients when she knowingly converted their fees and abandoned them. By practicing law in Colorado without a Colorado license, Respondent violated duties she owed as a professional.

*Mental State:* The entry of default establishes that Respondent acted knowingly when she converted funds belonging to Tulu, Kabuuza, Rucker, Canales, Orozco–Lopez, and Hernandez and when she practiced law without a valid license in the Vessels matter. The Court now concludes Respondent also knowingly failed to complete services she had agreed to perform for her clients and knowingly disregarded her clients' attempts to communicate with her.

*Injury:* Respondent caused serious injury to Tulu, Kabuuza, Rucker, Canales, Orozco–Lopez, and Hernandez when she knowingly converted their funds, including causing Canales additional financial hardship when he and Flores were forced to hire a new attorney without the benefit of Respondent returning their retainer. Respondent also compromised the integrity of the legal profession by tarnishing her clients' and the public's confidence in attorneys and the legal profession.

Further, Respondent abandoned six clients' cases, causing them serious potential injury when she failed to advance their efforts to remain in or bring family members to the United States legally. For instance, Flores described harm to her family that might not have happened but for Respondent's failure to perform her promised services. Flores testified that Canales's depor-

---

9. *See In re Roose*, 69 P.3d 43, 46–47 (Colo.2003).

tation resulted in undue stress, exacerbated her existing health problems, and caused her children to experience emotional problems. She also reported that the new attorney she hired to replace Respondent was unable to prevent her husband's deportation because, as she understood it, Respondent had not filed any paperwork on behalf of her husband and the immigration judge refused to grant additional extensions of time.

Padilla described similar injury due to Pena's deportation, which might not have happened had Respondent diligently represented him. For example, because her husband was deported, she had to find a job, could no longer look after her children, and had to arrange for many caregivers. She also testified that her oldest daughter suffered from depression and that her son's grades were severely affected. Her family also suffered financial harm and had no choice but to apply for food stamps.

Additionally, Respondent caused potentially serious harm to Tulu and his nephew. In his affidavit, Tulu attests that Respondent's failure to perform the services for which she was paid interfered with his efforts to bring his orphaned nephew to the United States to live with him. Tulu had to hire a new attorney to assist him, and the immigration status of his nephew, who was nearing adult status, was placed at risk.

Finally, the Court does not consider Vessels's testimony about the actual harm he suffered as a result of Respondent's misconduct. The injuries to which he testified do not arise from Respondent's established violation of Colo. RPC 5.5(a) but rather appear to stem from her alleged incompetence, a claim not set forth in case number 11PDJ084.[10]

### ABA *Standards* 4.0–7.0—Presumptive Sanction

Under the ABA *Standards*, the presumptive sanction for Respondent's misconduct is disbarment. ABA *Standard* 4.11 provides that disbarment is typically warranted when a lawyer knowingly converts client property and thereby causes injury or potential injury.[11] Similarly, ABA *Standard* 4.41 calls for disbarment when a lawyer causes serious or potentially serious injury to a client by knowingly failing to perform services for a client, engaging in a pattern of neglect with respect to client matters, or abandoning the practice.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating circumstances include any considerations or factors that may justify an increase in the presumptive discipline to be imposed, while mitigating circumstances may justify a reduction in the severity of the sanction.[12] The Court considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction.

*Prior Disciplinary Offenses—9.22(a):* In case number 08PDJ106, Respondent was suspended for one year and one day, with six months and one day stayed upon completion of a two-year period of probation, for failing to return her client's funds after the attorney-client relationship had been terminated. Her suspension was effective February 8, 2009. She then received a suspension in case number 10PDJ062 for one year and one day, all but six months stayed with a two-year period of probation for failing to appear at a hearing and to file an amended plan in her client's Chapter 13 bankruptcy case, resulting in the dismissal of the action. With respect to a second matter, Respondent practiced law without a license when she drafted wills for her clients. This suspension was effective March 1, 2011, and she was never reinstated from this suspension.

*Dishonest or Selfish Motive—9.22(b):* The Court finds that Respondent acted with a

---

10. *See* ABA Standards § II at 5 (directing a court imposing sanctions to determine "the extent of the actual or potential injury *caused by the lawyer's misconduct* ") (emphasis added).

11. Although Appendix 1 of the ABA *Standards* indicates that the standards applicable to violations of Colo. RPC 8.4(c) are ABA *Standards* 4.6 and 5.1, the Court determines that ABA *Standard* 4.1, "Failure to Preserve the Client's Property," is more relevant to conversion in violation of Colo. RPC 8.4(c).

12. *See* ABA *Standards* 9.21 & 9.31.

selfish motive when she knowingly converted clients' funds in six separate matters and abandoned her practice. After she was suspended in 2011, Respondent transferred some of her clients to another firm to handle their cases. She knew, however, that at least two of her cases had not been accounted for during this process. Nevertheless, she made no effort to contact those clients, and she now admits she did nothing for them.

*Pattern of Misconduct—9.22(c):* Respondent engaged in an extensive pattern of neglect by abandoning six separate clients during the same general timeframe. Thus, the Court applies great weight to this factor.

*Multiple Offenses—9.22(d):* Respondent committed more than half a dozen separate types of offenses: she practiced law in Colorado without a Colorado license, failed to respond to the People's requests for investigation, abandoned multiple clients, did not keep her clients reasonably informed about their cases, failed to keep her clients' funds in a trust account, did not provide her clients with written fee agreements or full accountings, neglected to return her clients' property upon termination, and knowingly converted her clients' funds. The Court accords this factor substantial weight.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* The People request application of this factor in aggravation, but the Court does not find it applicable. Respondent is aware of her misconduct. For instance, she admits that she abandoned at least two of her clients and that she completed no work in the Pena matter.

*Vulnerability of Victim—9.22(h):* The Court has no knowledge of whether many of Respondent's clients could properly be considered vulnerable. However, the Court is aware that Flores and Padilla are foreign immigrants who do not speak fluent English and who relied on Respondent to help their husbands remain in the United States. Thus, the Court views these two clients as vulnerable victims.

*Indifference to Making Restitution—9.22(j):* The Colorado Attorneys' Fund for Client Protection reimbursed Respondent's clients $18,700.00 for her conversions.[13] Although Respondent has been unemployed since April 2011, she had not made even a small payment in restitution as of the sanctions hearing. However, she gave credible testimony that she wants to begin making contributions to reimburse the Fund as soon as she gets a job. As such, the Court will apply this factor but give it relatively little weight.

*Personal or Emotional Problems—9.32(c):* The Court heard extensive testimony from psychiatrist Michael Sturges, M.D., attorney Sally Zeman,[14] and Respondent herself regarding Respondent's personal and emotional problems during the time of her misconduct. Their testimony indicated that even as early as childhood, Respondent may have struggled with depression, which significantly worsened after the death of her stepmother in 2010. Between May 2010 and April 2011, Respondent's house flooded, resulting in the loss of her possessions and the foreclosure of her residence. Due to financial hardship, Respondent was then forced to return her four-year-old dog to its breeder. During this same time period, Respondent was primarily a solo practitioner and attempted unsuccessfully to transition her practice into another firm.

While in the throes of her depression, Respondent disregarded correspondence from the People and largely ignored her obligations to cooperate in these disciplinary matters. Although she transferred some of her cases to another firm in March 2011, she did not attend to many of her clients' cases or assist them to find other counsel. Respondent continued to suffer from significant depression through 2013, when she moved from Colorado to Texas. In Texas, she lived temporarily with her family and then in a homeless shelter. Respondent eventually moved to Florida to live with her biological mother. She has sought regular therapy

---

13. Ex. A.

14. Zeman has served as the Chapter 13 Bankruptcy Trustee for the State of Colorado since 1989 and first met Respondent in 2008 when

Respondent was appointed as substitute counsel in approximately thirty Chapter 13 bankruptcy cases.

there and has taken medications to treat her condition, which has improved but still necessitates treatment. Respondent admits that she is not yet ready to resume the practice of law. The Court believes Respondent's severe depression contributed to her neglect of her professional duties, and it therefore accords substantial weight in mitigation to this factor.

*Character or Reputation—9.32(g):* Respondent has been volunteering fifteen to twenty hours a week for Catholic Charities over the past few months. There, she runs a workforce development program and counsels people who are unemployed. She also teaches a course, assists clients with rewriting their resumes, and helps them find and apply for jobs. The Court considers Respondent's commitment to this organization as evidence of her good character.

*Mental Disability or Chemical Dependency—9.32(i):* This standard provides that a mental disability or chemical dependency is a mitigating factor only when:

   (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
   (2) the chemical dependency or mental disability caused the misconduct;
   (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
   (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

Measured against these criteria, the Court cannot find that this factor mitigates Respondent's misconduct. Dr. Sturges testified that Respondent still suffered from severe depression as of her second IME, but he could not state that Respondent has been successfully rehabilitated. Rather, he could only opine that she was in partial remission and would need additional therapy and medi-

cation in order to continue to improve. Further, he did not express an opinion whether her depression caused her misconduct. In fact, he testified that he never discussed with her whether she knew during all relevant periods that she was causing injury to or abandoning her clients. Dr. Sturges also stated that at the time of her misconduct Respondent knew the difference between right and wrong and was aware of her ethical responsibilities. Because no other evidence was offered, the Court cannot find that this mitigating factor applies here.

*Remorse—9.32(l):* Respondent testified that she is extremely sorry for what happened to her clients. She also apologized to the Court for neglecting her obligations in these disciplinary proceedings. The Court finds her remorse credible and applies this factor in mitigation.

### Analysis Under ABA *Standards* and Colorado Case Law

■ The Court is aware of the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[15] mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[16] Though prior cases are helpful by way of analogy, the Court is charged with determining the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

In this case, ABA *Standards* 4.11 and 4.41 prescribe disbarment. Further, the ABA *Standards* counsel that in cases involving multiple types of attorney misconduct, the ultimate sanction should at least be consistent with the sanction for the most serious disciplinary violation.[17]

■ The Colorado Supreme Court likewise has held that, except where significant mitigating factors apply, disbarment is the

---

15. *See In re Attorney F.,* 285 P.3d 322, 327 (Colo. 2012); *In re Fischer,* 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

16. *In re Attorney F.,* 285 P.3d at 327 (quoting *People v. Rosen,* 198 P.3d 116, 121 (Colo.2008)).

17. ABA *Standards* § 2 at 7.

appropriate sanction for knowing conversion of client funds in violation of Colo. RPC 8.4(c).[18] Where a lawyer's conversion of client funds is coupled with abandonment of the client, it is all the more clear that disbarment is warranted. For example, in *People v. Kuntz*, the Colorado Supreme Court determined disbarment was appropriate when a lawyer accepted legal fees from several clients, performed little to no work on their cases, and then abandoned the clients without returning their funds.[19] Similarly, in *In re Stevenson*, a lawyer was disbarred after abandoning his client and misappropriating funds.[20] The Colorado Supreme Court noted in *Stevenson* that the lawyer's failure to participate in the disciplinary proceeding underscored the decision that disbarment was appropriate.[21]

■ Although mitigating factors merit close examination and may in some cases warrant a departure from the presumption of disbarment,[22] this is not such a case. The Court is sympathetic to Respondent's circumstances and emotional problems, but she has not established sufficient mitigating evidence to justify deviating from the presumptive sanction of disbarment. To the contrary, the balance of aggravating and mitigating circumstances weighs in favor of disbarment. Accordingly, the Court concludes Respondent should be disbarred.

## V. *CONCLUSION*

Respondent abandoned several clients, converted fees from many of those clients, and failed to cooperate in these disciplinary proceedings. Attorneys occupy a position of trust and responsibility and are expected to adhere to high moral and ethical standards. Respondent disregarded these standards and caused serious injury and serious potential injury to her clients. In light of the egregious nature of Respondent's repeated misconduct and the substantial aggravating factors at work here, the Court finds disbarment is warranted.

## VI. *ORDER*

The Court therefore **ORDERS**:

1. **DAYNEL L. HOOKER**, Wisconsin attorney registration number 1033854, is **DISBARRED** from the practice of law **IN THE STATE OF COLORADO**. The **DISBARMENT SHALL** take effect only upon issuance of an "Order and Notice of Disbarment." [23]

2. Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

3. Respondent also **SHALL** file with the Court, within fourteen days of issuance of the "Order and Notice of Disbarment," an affidavit complying with C.R.C.P. 251.28(d).

4. The parties **SHALL** file any post-hearing motion or application for stay pending appeal with the Court **on or before Friday, November 8, 2013.** No extensions of time will be granted. Any response thereto

---

18. *See In re Haines*, 177 P.3d 1239, 1250 (Colo. 2008) (disbarring an attorney who knowingly misappropriated $70,000.00 belonging to her client's estate); *In re Cleland*, 2 P.3d 700, 703 (Colo.2000) (disbarring an attorney who knowingly misappropriated his client's funds, commingled funds, and misrepresented the status of his client's case); *People v. Varallo*, 913 P.2d 1, 10–11 (Colo.1996) (holding that the presumed sanction for knowing conversion of client funds is disbarment, regardless of whether the lawyer intended to permanently deprive the client of those funds).

19. 942 P.2d 1206, 1208 (Colo.1997); *see also People v. Roybal*, 949 P.2d 993 (Colo.1997) (disbarring attorney for abandoning clients, failing to return unearned fees, and engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

20. 979 P.2d 1043, 1044–45 (Colo.1999).

21. *Id.* at 1045.

22. *In re Fischer*, 89 P.3d at 822; *In re Cleland*, 2 P.3d at 703 ("When a lawyer knowingly converts client funds, disbarment is 'virtually automatic,' at least in the absence of significant factors in mitigation.").

23. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

**SHALL** be filed within seven days, unless otherwise ordered by the Court.

5. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** file a "Statement of Costs," **within fourteen days of the date of this order.** Respondent may file her response to the People's statement, if any, within seven days thereafter.